IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:10-CT-3123-BO

| | |
|---|---|
| SHAUN A. HAYDEN<br>    Plaintiff, | )<br>)<br>) |
| v. | )<br>) |
| PAUL G. BUTLER,<br>    Defendant. | )<br>)<br>)<br>) |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Mr. Shaun A. Hayden is a juvenile offender who was sentenced to life imprisonment with the possibility of parole. Over thirty years ago, when he was a juvenile of 15 years old, Mr. Hayden committed multiple violent felonies, including first degree rape. Now, he is an adult of 48 years. He is among the first set of juvenile offenders being considered for parole in the wake of the Supreme Court's decisions in *Graham v. Florida*, 560 U.S. 48 (2010) and *Miller v Alabama*, 132 S.Ct. 2455 (2012). Those cases recognized the special characteristics of juvenile offenders—most notably, juveniles' greater capacity for rehabilitation as compared to adult offenders. Because of this quality, Mr. Hayden is owed something that adult offenders are not: a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75.

Currently, North Carolina's Parole Commission provides Mr. Hayden and his fellow juvenile offenders the same minimal parole review process that it affords to regular adult offenders—i.e., the Commission reviews a summary of the offender's prison file and provides a

1

written statement of reasons for the denial of parole. The Parole Commission does not provide notice to a juvenile offender in advance of his parole review; there is no opportunity for a juvenile offender to be heard during the course of his parole review; and the Commissioners do not hold an in-person hearing to deliberate together on the question of a juvenile offender's suitability for parole. The Parole Commissioners are not even aware whether a particular offender was a juvenile at the time of his offense. Furthermore, the sheer volume of the Commission's work precludes meaningful consideration.

Though North Carolina's parole process may be constitutionally sufficient for adult offenders, it is insufficient for juvenile offenders as a matter of law.

## FACTS

Plaintiff Shaun Hayden was born on October 6, 1966. Ex A, Declaration of Shaun Hayden at ¶ 1. On April 29, 1982, May 23, 1982, and August 21, 1982, Mr. Hayden was fifteen years of age. *Id.* at ¶ 2. On these dates, he committed multiple violent felonies. *Id.* at ¶ 3. On March 16, 1983, at the age of sixteen years, Mr. Hayden pled guilty to First Degree Burglary; Attempted Rape; Assault With a Deadly Weapon With Intent to Kill Inflicting Serious Injury Not Resulting in Death; First Degree Sexual Offense; Breaking and Entering; Larceny; Second Degree Sexual Offense; Attempted Second Degree Rape; and First Degree Rape. *Id.* at ¶ 4. The Superior Court consolidated Mr. Hayden's offenses for judgment, and Mr. Hayden was sentenced to life imprisonment. *Id.* at ¶ 5. Mr. Hayden became eligible for parole in 2002. *Id.* at ¶ 6. He has been rejected annually for parole since that date, considered under the normal adult offender parole procedures. *Id.* at ¶ 7; Ex. B, Parole Comm'n Records.

North Carolina has established the Post-Release Supervision and Parole Commission (the "Parole Commission") as an independent agency responsible for evaluating offenders for parole

2

release. *See* N.C.G.S. § 143B-720(a). Currently, there are four appointed Parole Commissioners empowered to vote on felony parole cases, including Plaintiff's case. They are: Paul Butler (the Chair of the Parole Commission), Bill Fowler, James Forte, and Danny Moody. Ex. C, N.C. Department of Public Safety, North Carolina Parole Commissioners. There are two levels of parole consideration. Ex. D, Deposition of Mary Stevens at 20. Most offenders, including Mr. Hayden, have only ever received the first level of consideration—the parole "review." *Id.* at 20. If Commissioners want to look in more depth at a particular parole candidate, they must request a second level of consideration—the parole "investigation." *Id.* at 98. Mr. Hayden has never received an "investigation." Ex A, Declaration of Shaun Hayden at ¶ 8.

For the parole "review" process, the Commission employs a team of parole case analysts to assist the Commissioners in their work. Ex. D, Stevens Deposition at 33. These individuals first calculate an offender's parole eligibility date, and enter it in the computer. *Id.* at 33-34. Once an offender is eligible, the parole case analyst reviews the prison file, and creates a written summary. *Id.* at 21, 25, & 41. The offender is not notified of these proceedings in advance. *Id.* at 44. Caseloads are high: each parole case analyst is responsible for about 4,388 offenders. *Id.* at 28. According to Paul Butler, the Chair of the Parole Commission, the most important information that goes into the summary includes the following:

- the Official Crime Version (a narrative of the events of the crime of conviction)
- Prison infraction history
- Gang membership
- Psychological evaluations
- Custody level history
- Visitation history
- Home plan

Ex. E, Deposition of Paul Butler at 51-52. According to Butler, he gives special weight to the "brutality of the crime." *Id.* at 54-55. The Parole Commission has the ability to order its own

3

tailored psychological report at the "investigations" stage. *Id.* at 35. At the "review" stage, however, the parole case analyst relies on any psychological evaluations that happen to be contained within the prison file—though parole case analysts are not trained on psychological assessment tools or how to interpret them. Ex. D, Stevens Deposition at 63.

After writing the summary of the prison file, and making a written recommendation for or against granting parole, the parole case analyst provides the information to a Commissioner. *Id.* at 43. The Commissioners make independent electronic votes while sitting alone in their officers in front of computer screens. Ex. E, Butler Depo. at 50; Ex. D, Stevens Depo. at 104, 107. They do not consult one another in casting their ballots, nor do they cast their ballots in the same room. Ex. E, Butler Depo. at 50-51. On a "fairly typical day," a Commissioner casts approximately 91 votes. *Id.* at 25. Simultaneously, the Commissioners have many other tasks to complete, including presiding over Post-Release Supervision Revocation hearings, *id.* at 24, attending trainings, *id.* at 14, overseeing office administration, *id.* at 18-19, reviewing statistical reports, *id.* at 23, making field visits to jails and probation offices, *id.* at 31, approving warrants for arrest, *id.* at 33, and meeting with members of the public on Tuesdays. Ex. D, Stevens Depo. at 71. The Commissioners vote on felony parole cases five days a week. Ex. E, Butler Depo at 62.

Usually, a Commissioner votes "no" on felony parole at the "review" stage. Ex. D, Stevens Depo. at 98. If he does not, he will typically vote "Incomplete", and recommend an "investigation." *Id.* At the "investigation" stage, the parole case analyst notifies the offender, the offender's prison facility, the victim, the prosecuting district attorney, and law enforcement. *Id.* at 45, 48-49. It is normal practice for the Commission to order a psychological report be conducted on the offender. Ex. E, Butler Depo. at 35. All such reports must be completed by the

4

Parole Commission's one staff psychologist, Dr. Denis Lewandowski. Ex. D, Stevens Depo at 18. The probation department is requested to investigate the feasibility of the offender's proposed home plan. *Id.* at 54. If the "investigation" shows that the candidate for parole is promising, the Parole Commission will typically offer a "MAPP contract"[1]—which is a contract between the offender, the prison, and the Parole Commission. Ex. E, Butler Depo. at 36. The contract lets an offender "work through different custody levels" and "get on work release" for one to five years before they are released. Ex. D, Stevens Depo. at 77-79. The MAPP contract is ordinarily a mandatory step toward felony parole. *Id.* at 20-21, Ex. E, Butler Depo. at 60.

One additional source of information about some offenders is the Commissioners' meetings with the public. Members of the public have the right to visit the Parole Commission on Tuesdays—though the available slots can and do fill up. Ex. D, Stevens Depo. at 71. Availability is on a first-come, first-serve basis, so if a member of the public misses an offender's annual parole review, he or she must try again the following year. *Id.* at 71-72.

Throughout this process, the Parole Commission gives no consideration to an offender's age at the time of his offense. Ex. E, Butler Depo. at 54. The Commission does nothing differently with juvenile offenders as compared to adult offenders. Ex. D, Stevens Depo. at 39. Every felony offender—adult or juvenile—is reviewed in the same way. *Id.* Statistical analysis shows that older offenders—i.e., offenders who have reached 58 to 59 years of age—are more likely to be paroled than younger offenders. Ex F, Expert Report of Bryan Gilbert Davis at 8. This means that juvenile offenders are disadvantaged in the parole process because their young age at the time of their offense necessarily means they will serve more years in prison before reaching the average age of a paroled inmate.

---

[1] "MAPP" stands for Mutual Agreement Parole Program. (Stevens 21).

5

As of September 2014, the Parole Commission had reviewed about 15,200 parole cases in 2014—and this volume did not include the other work that the Commissioners must do. Ex. D, Stevens Depo. at 106. Because of the severe backlog of parole files to review, it "causes problems" if a Commissioner spends too much time reviewing an offender's file. *Id.* at 117, Ex. E, Butler Depo. at 58.

## ARGUMENT

### I. Standard on Summary Judgment

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The movant has "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Rule 56(c)). Further, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Rule 56(e)).

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. In opposing summary judgment, nonmovants must do more than present a mere scintilla of evidence in their favor. They must present sufficient evidence that reasonable jurors could find for them by a preponderance of the evidence. An apparent dispute is "genuine" only if "the nonmovant's version is supported by sufficient evidence to permit a reasonable jury to find in the nonmovant's favor." *Sylvia*

6

*Development Corp. v. Calvert County, Md.*, 48 F.3d 810, 818 (4th Cir. 1995) (internal quotation marks and citation omitted).

## II. A Juvenile Offender's Due Process Right to Meaningful Parole Procedures

### A. Applicable Law

The Fourteenth Amendment's Due Process Clause guards against unlawful deprivations of life, liberty, or property. U.S. Const. amend. XIV §1. In analyzing the plaintiff's due process claim, the court must consider whether, and to what extent, a juvenile offender has a protectible interest under the Clause. *See Greenholtz v. Inmates of the Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979); *Burnette v. Fahey*, 687 F.3d 171, 181 (4th Cir. 2012). If plaintiff has asserted a protectible interest, the court must determine whether the State has afforded him the "minimum procedural protections required by the Fourteenth Amendment" in the course of depriving him of that interest. *Burnette*, 687 F.3d at 181 (citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

"A liberty interest may arise from the Constitution itself" or "from an expectation or interest created by state laws or policies." *Wilkinson v. Ausin*, 545 U.S. 209, 221 (2005). The Due Process clause protects only those interests to which an individual has a legitimate claim of entitlement. *Greenholtz*, 442 U.S. at 7. For adult offenders, a State is not constitutionally obligated to provide a parole regime. *See Vann v. Angelone*, 73 F.3d 519, 521 (4th Cir. 1996). Therefore, adult offenders' limited right to consideration for parole finds its roots in State law. *See Burnette*, 687 F.3d at 181. When, however, a state creates a liberty interest, the Due Process clause requires fair procedures for its vindication – and federal courts will review the application of those constitutionally required procedures. *Swarthout v. Cooke*, 562 U.S. 216 (2011) (holding that California parole process constitutionally adequate). Given the right's genesis in state law, it is unsurprising that federal courts afford the State "a wide range . . . for the exercise of

discretion" with regard to parole for adult offenders. *Id.* (quoting *Franklin v. Shields*, 569 F.2d 784, 800 (4th Cir. 1977) (en banc)).

Juvenile offenders, however, are a different matter. Juvenile offenders are the first group that has been granted a federal constitutional right to meaningful parole consideration. In *Graham v. Florida*, the Supreme Court stated: "The State must . . . give [a juvenile offender] some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75. Thus, juvenile offenders' protectible interest under the Due Process Clause is weightier than the interest of adult offenders. Courts must not grant States as much deference on this matter.

### B. Application

The Fourth Circuit has set a low bar for procedural due process with regard to adult offender parole consideration. *See Franklin v. Shields*, 569 F.2d 784, 800 (4th Cir.1996) (en banc). Indeed, the Fourth Circuit's requirements are even lower than the Supreme Court's standards. The Supreme Court has contemplated that the minimum parole process due to adult offenders is (1) an opportunity to be heard, and (2) a statement of reasons why parole was denied. *Greenholtz*, 442 U.S. at 16. The Fourth Circuit, however, has concluded that: "the only explicit constitutional requisite is that the Board furnish to the prisoner a statement of its reasons for denial of parole." *Id.* at 801.

North Carolina's parole procedures are the bare minimum necessary to comply with the Fourth Circuit's rule for adult offenders. Aside from the written statement of reasons, the Parole Commission does not comply with any of the other traditional hallmarks of due process. There is no notice to offenders prior to the hearing. There is no opportunity for the offender to be heard—either in writing or in person. And the Commissioners do not even hold a hearing to

8

deliberate together on the matter. Rather they cast ballots electronically, on an individual basis, and at an extremely rapid rate that does not permit much time for individual consideration. On an average week, they vote on about 455 cases, while also completing many other time consuming tasks such as presiding over Post-Release Supervision Revocation hearings, attending trainings, overseeing office administration, reviewing statistical reports, making field visits to jails and probation offices, approving warrants for arrest, and meeting with members of the public. As of September 2014, the Parole Commission had reviewed over 15,000 cases during 2014. Indeed, due to the high volume of the work, the Parole Commission's Administrator testified that it causes "problems" if a Commissioner spends too much time reviewing an offender's file. Ex. D, Stevens Depo. at 117.

In other words, in terms of parole review, North Carolina offenders get a very minimal review of their prison file, and a statement of reasons why they were denied. These practices are inadequate as applied to juvenile offenders because they do not provide a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." It is simply not possible for a juvenile offender to "demonstrate" his maturity and rehabilitation to the Parole Commission when he is not given notice in advance of his consideration date, and when he is not entitled to be heard on the question—either in writing or in person. The offender is an entirely passive participant in North Carolina's parole review process. He is given no chance to "demonstrate" anything.

The reason why it is important to give more robust parole procedures to juvenile offenders is the fact "children are different." *Miller*, 132 S.Ct. at 2470. Juveniles have "lessened culability" and a "greater capacity for change." *Miller*, 132 S.Ct. at 2460. Indeed, "[o]nly a relatively small proportion of adolescents who engage in illegal activity develop entrenched

9

patterns of problem behavior." *Roper v. Simmons*, 543 U.S. at 570. "As years go by and neurological development occurs," it is more likely that "deficiencies will be reformed." *Miller*, 132 S.Ct. at 2465. These weighty considerations led the Supreme Court to conclude that the Constitution requires that juvenile offenders be granted a "meaningful opportunity" to demonstrate their unique "capacity for change," or their "neurological development." But North Carolina treats juvenile offenders in the same cursory fashion that it treats adult offenders, and does not permit them the notice or opportunity to demonstrate anything at all.

A life sentence is a particularly harsh punishment for a juvenile offender. "Under this sentence a juvenile offender will on average serve more years and a greater percentage of his life in prison than an adult offender. A 16-year-old and a 75-year-old each sentenced to life . . . receive the same punishment in name only." *Graham*, 560 U.S. at 70. The Supreme Court's concern that juvenile offenders actually serve *more* time than adult offenders is compounded by the fact that statistically, North Carolina tends to parole older offenders more readily. The average age of parole in North Carolina is 59 years. It takes a 16 year old forty-three years of imprisonment to get to that stage. Thus, the State's parole process actually disadvantages juvenile offenders because it takes them more years of incarceration to get to the age at which North Carolina tends to begin to seriously consider parole.

Beyond this, there is evidence that North Carolina's parole officials have actually recommended against Mr. Hayden's parole precisely because he was a juvenile when he went to prison. Parole case analysts recommended against plaintiff's parole, relying on a prison psychological assessment. Ex. G, Parole Case Analyst Review. The assessment concluded that plaintiff might always require supervision because "he has spent most of his developmental life in prison" and therefore is "unlikely [to have] sufficient coping skills and decision making

10

ability." Ex. H, Confidential Risk Assessment. In other words, a parole case analyst has actually recommended against plaintiff's parole *because he has been in prison since he was so young.* Ex. G, Parole Case Analyst Review. The fact that plaintiff is a juvenile offender has been used against him as a reason to deny parole. He was never given a chance to rebut this conclusion, or to "demonstrate his maturity"; instead, he was discriminated against because he is a juvenile offender.

When juvenile offenders, like plaintiff, are considered in the same way as adult offenders, they are systematically disadvantaged. We know that the N.C. Parole Commission gives no consideration to whether an offender was a juvenile or not—instead they are considered in exactly the same way. Ex. E, Butler Depo. at 54; Ex. D, Stevens Depo. at 39. There is no consideration of the unique characteristics of the juvenile offender, including whether that offender has matured and demonstrated an ability to abide by societal norms and become a law-abiding resident of the community. By Butler's own admission, he considers the most important information about a parole decision to be the brutality of the crime, though he has no information before him about the extent to which a youthful offender's immaturity or other no-longer-extant circumstances may have contributed to those actions. The list of other factors that Butler considers important does not even contain information about the offender's opportunities and efforts within the Division of Adult Correction to rehabilitate himself through classes and programming. The Parole Commission is vested by statute with the authority to adopt rules and regulations governing how prisoners eligible for parole have their cases reviewed and investigate and governing how parole proceedings are initiated and considered, as long as those rules and regulations are not inconsistent with North Carolina law. N.C. Gen. Stat. § 143B-720(c). Accordingly, it is within the Parole Commission's power to develop and implement procedures

11

that would identify juvenile offenders, provide more relevant information for the Commission's consideration, require sufficient time for evaluation and analysis of these offenders by the Commissioners, and otherwise provide a meaningful opportunity for those offenders to demonstrate that they have matured and been rehabilitated.

The U.S. Supreme Court has categorically banned "Life Without Parole" as a punishment for nonhomicide offenders. *Graham v. Florida*, 560 U.S. 48 (2010). Absent some meaningful parole process for nonhomicide juvenile offenders like Mr. Hayden, his life sentence is *de facto* one of "Life Without Parole"—because he will never be granted the opportunity to obtain release by demonstrating his increased maturity. For all of the reasons set forth above, Mr. Hayden respectfully requests that the Court enter an order declaring North Carolina's current parole regime unconstitutional as applied to juvenile offenders, and set a trial to determine what adequate procedural protections should be implemented.

Respectfully submitted,   /s/Elizabeth G Simpson
 Elizabeth G Simpson
 N.C. State Bar No. 41596
November 3, 2014   Mary S. Pollard
 N.C. State Bar No. 20081
 Attorneys for Plaintiff
 N.C. Prisoner Legal Services, Inc.
 1110 Wake Forest Road
 Raleigh, North Carolina 27604
 Telephone: (919) 856-2200
 E-mail: esimpson@ncpls.org

CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

        Jodi Harrison
        N.C. Department of Justice
        P.O. Box 629
        Raleigh, NC 27602
        919-716-6573
        Fax: 919-716-0001
        Email: jharrison@ncdoj.gov

                              /s/ Elizabeth G. Simpson
                              Elizabeth G. Simpson
                              N.C. State Bar No. 41596
                              Mary S. Pollard
                              Attorneys for Plaintiff
                              N.C. Prisoner Legal Services, Inc.
                              1110 Wake Forest Road
                              Raleigh, North Carolina 27604
                              Telephone: (919) 856-2200
                              E-mail: esimpson@ncpls.org