# In The Matter Of:

*Hayden v.*
*Butler*

---

*Stevens, Ms. Mary*
*August 28, 2014*

---

*Pace Reporting Service, Inc.*
*PO Box 252*
*Cary, NC  27512*
*919-859-0000*

Original File Stevens 8-28-14.prn

Min-U-Script® with Word Index

Ex. F

1     sense?

2  A   It does.

3  Q   Okay.  Are you under the influence of any drugs or

4      medication today?

5  A   No.

6  Q   Is there any reason that you know of why you can't

7      participate in this deposition?

8  A   No.

9  Q   Okay.  Then--also, just to state, we understand

10     that you've been produced pursuant to Rule 30(b)(6)

11     and that you represent the Parole Commission.  Is

12     that how you understand it?

13 A   Yes.

14 Q   Okay.  Thanks.  So what is your position with the

15     Parole Commission?

16 A   I am the chief administrator.

17 Q   And how long have you been in that capacity?

18 A   I've been performing my current job duties since

19     January of 2010.  The actual title, it was under--

20     the original title was administrative officer.  But

21     our department's personnel reclassified my position

22     in May of 2013 and gave me the working title of

23     chief administrator.

24 Q   Did you work at the Parole Commission before

1    A      Eighty--1983.

2    Q      How is the Parole Commission organized today?

3    A      We have four commissioners, one being the chairman.

4          And then I am underneath the chairman.

5    Q      Okay.

6    A      And then the staff, we have them divided. We have

7          a staff psychologist who reports directly to the

8          chairman. The chairman has a confidential

9          secretary that reports directly to him. Who

10        reports to me are two lead parole case analysts.

11        They are the supervisors of the parole case

12        analysts. I have reporting to me a--the rest of

13        the support staff report to me. And that would be

14        an administrative assistant, three Office Assistant

15        V positions. We have two women that share the

16        telephone receptionist position. We have three

17        processing assistants. Two word processor

18        positions report to me. And one of the parole case

19        ana--two parole case analysts report to me.

20        They're in specialized positions. One handles the

21        misdemeanor driving while impaired population, and

22        the other is a contract position. It's a part-time

23        position.

24    Q      How many people total work in the Parole

1      the manual?

2   A      The manual is the--the best--outlines our work

3      practices.

4   Q      Uh-huh (yes). And you don't keep it anywhere else,

5      that information, your work practices?

6   A      Well, when I'm training analysts, we have training

7      manuals that have examples that I would pull out,

8      and we would go over those cases. We learn here by

9      teaching. We would have that.

10   Q      Anything else?

11   A      They've been--I don't know that they have a

12      complete amount, but we--I have had the staff print

13      them--the e-mails since I've been the

14      administrative officer. I keep finding some that

15      they've missed. But they have tried to put the new

16      analysts I'm training a book together of that.

17   Q      Anything else you can think of?

18   A      I don't think so.

19   Q      Who is the administrative officer? You mentioned

20      that person.

21   A      They're--they're--they changed my--the--they

22      reclassified. Yes. Uh-huh (yes).

23   Q      So do you still oversee the special programs?

24   A      Yes. A special program could be our dri--through

1          call the--a MAPP investigation, Mutual Agreement

2          Parole Program.  Or incomplete could be when

3          they're asking for Dr. Lewandowski to do a

4          psychological evaluation.  They're basically asking

5          for some type of gathering of information.  And--

6          and so that's the difference in them.  And then

7          after that investigation is completed or the

8          information they've sought has been obtained, then

9          the analyst will re-present the case in another

10         review to the Commission for their decision.

11    Q    What about a DWI coordinator?  Is that a position

12         still?

13    A    Yes.  Well, it's been reclassified to a DWI parole

14         case analyst.

15    Q    How do you--

16    A    Technically does the same job; it's just--

17    Q    Let me back up for a second.  How many parole case

18         analysts do you have right now?

19    A    Sixteen.

20    Q    And how many DWI parole analysts do you have?

21    A    One.

22    Q    Is that one of the sixteen?

23    A    Yes.

24    Q    So there's seventeen--

1       and commitment or something and tell the analyst

2       that there's been an amended--the computer record

3       will show what has changed.

4   Q   Uh-huh (yes).  And when--how does a parole case

5       analyst work a case that's eligible for parole?  So

6       say it's a case review.  What does the parole case

7       analyst do?

8   A   The analyst will--

9   Q   I'm talking about a Parole Case Analyst II.

10  A   The analyst--the first time the offender comes up

11      for review--the earliest is sixty days before the

12      parole eligibility date or it could be at the

13      parole eligibility.  We had a chairman that only

14      wanted to see them at the parole eligibility date.

15      But they--the analyst will basically research the

16      record.  They will review computer records and the

17      inmate file that we see in OmniDocs and will write

18      up a review in the computer system, a written

19      review, using specific criteria that the Commission

20      has said they want to know about a case.

21              They will write a written case

22      presentation that we call parole reviews to the

23      Commission, and they would make a recommendation in

24      the review on what their recommendation is.

1      investigation only?

2   A    Yes.

3   Q    And the victim gets it at every single review--

4   A    Yes.

5   Q    --before the review?

6   A    Any active victim, yes, since December 2012.

7   Q    How does a victim become an active victim?

8   A    They have sent a written request to be registered

9      with the department as a victim. And when I

10     mentioned--there are some--we have entered some

11     sheriffs in the system based on prior instructions

12     of a prior chairman. Chairman Mann instructed

13     analysts to do that.

14   Q    Do--does a parole case analyst ever investigate a

15     release plan if there hasn't been an investigation?

16   A    No.

17   Q    And how exactly does it come to be that a case is

18     being investigated for parole?

19   A    The commissioners must by majority vote vote to

20     investigate for parole.

21   Q    Do commissioners ever vote to grant parole without

22     an investigation?

23   A    They do on the misdemeanor DWI population that's

24     being paroled to a treatment--to the treatment

1      regular rules that a state worker might, meaning

2      the person is hired at the--the chairman hires that

3      position.  And if the chairman leaves, that

4      position doesn't have the same state rights to

5      employment.

6   Q  Okay.  Are there any other positions in the office

7      that we haven't talked about?

8   A  I don't think so.

9   Q  Back to the parole analyst.  I'm wondering what

10     their caseload looks like, like the volume of work

11     that they have.  So if you could tell me about the

12     number of parole-eligible inmates they have, the

13     number of--and the other types of work that they do

14     'cause I know that there's a lot of different

15     things that they also do.

16  A  I can't divide it up between parole or post-

17     release.  I can give you a figure on their

18     caseload, their number.

19  Q  Okay.

20  A  The Parole Case Analyst IIs that have the--that can

21     handle anything--

22  Q  Yeah.

23  A  --their caseloads right now are around four

24     thousand three hundred and thirty-eight each--each

1    except for the part-time.  He--he handles--he

2    works--he has a thousand cases less than that

3    because he works about--he works seventy-five

4    percent of their time.  So he's got seventy-five

5    percent of the caseload.  The DWI parole case

6    analyst has eight hundred and fifty cases.  Her

7    caseload will probably go up since they're putting

8    female DWIs with her now.  And I have no idea what

9    it would go up to.

10              The Parole Case Analyst Is that handle

11   what I said the JRA caseload, they have about a

12   thousand seven hundred cases each.  We have one--

13   one of the analysts that's one of the Parole Case

14   Analyst IIs is one of the recent positions hired,

15   and they have half of a caseload.  One of the other

16   supervisors has the other half of the four thousand

17   three hundred.  So they have--they have about two

18   thousand one hundred cases.  We're going to

19   transfer the rest of that supervisor's caseload

20   into them within the next thirty days.

21   Q    Okay.

22   A    The--the analysts being trained, we're training

23        them--they have twenty-five cases or less--up to

24        twenty-five cases.  We don't give them a caseload

| | | |
|---|---|---|
| 1 | Q | Figuring out the eligibility date and-- |
| 2 | A | And they would enter that information on the |
| 3 | | computer in an event we call eligibility |
| 4 | | certification.  They would explain the eligibility. |
| 5 | | And the computer should match the eligibility.  If |
| 6 | | it doesn't, they have to bring it to me. |
| 7 | Q | What's the volume of work that the psychologist |
| 8 | | has? |
| 9 | A | I don't know the answer to that.  There probably at |
| 10 | | any time are more mental health aftercare reque-- |
| 11 | | that's what we call it--requests, memos that he has |
| 12 | | to do versus psychological evaluations.  But how |
| 13 | | many he has pending in either category I don't |
| 14 | | know.  I think he also in early medical release |
| 15 | | will--he is involved in--when they are looking-- |
| 16 | | when prisons is looking at those cases, he may go |
| 17 | | out to a prison facility with a prison staff person |
| 18 | | to interview the inmate.  So, I mean, that's--but |
| 19 | | how many he does I don't know. |
| 20 | Q | What are the job qualifications for a parole |
| 21 | | analyst? |
| 22 | A | For the Parole Case Analyst I level, it's--it's |
| 23 | | written that they have a four-year college degree |
| 24 | | plus three years work experience in probation/ |

1      parole or in criminal--in a criminal justice field

2      with knowledge of sentencing laws and statutes or a

3      combination of education and work experience.  We

4      have to write that in job descriptions.  Could be a

5      combination.  The Parole Case Analyst II has the

6      same qualifications except the work experience is

7      five years.  And the Parole Case Analyst III is the

8      same qualifications with the work experience being

9      six years.

10  Q   Who participates in the hiring process?

11  A   I--one of the lead parole case analysts could be

12      involved or a commissioner could be involved or

13      form--we have had a former parole case analyst

14      involved in the interview process.  The chairman is

15      the hiring authority, so it's his decision.  And

16      the administrative assistant as I said does the

17      paperwork.  And I'm generally the--I can serve on

18      the interview team or I have--I generally do the

19      questions, and we do a writing test.  I prepare all

20      that and the--how you score it, how we score.

21  Q   Does the chairman sit in on interviews then?

22  A   No.  As hiring authority, he's--the department does

23      not want them to be a part of the interview team.

24      So it would be--generally it's a commissioner and

1    me or a lead parole case analyst.  We have had--

2    someone in community supervision has sat in on past

3    interviews also.  One of their--one of their

4    directors has done it.  Usually the panel is either

5    two or three people sitting on the interview team.

6  Q  And you've talked a little bit about training, but

7    now I'm going to ask you about training that you

8    give to parole case analysts.  How--how do you

9    begin the training process for a new hire?

10  A  The--we have--the parole case analyst begins their

11    training as an in-house training, but they also are

12    required to do training that the department

13    requires of state employees.  So it could be--it

14    varies per person depending on their work

15    experience on what they would need department-wise.

16    I mean, the department has certain classes they

17    require of any employee depending on where you come

18    from.  I mean, it could be something like ethics

19    training or it could be something as simple--

20    recently we had to do training of how to use our

21    new telephone system.  I mean, it could be going to

22    a class somewhere or it could be a training module

23    or just--you do them over the computer.

24        The in-house training for analysts that I

1       am--the two lead parole case analysts would

2       participate in some of the training is--generally

3       it takes four to six months to train an analyst to

4       assume a caseload, four months if you're assuming

5       the JRA caseload, the Parole Case Analyst I

6       caseload.  But for the Parole Case Analyst II

7       position, it's generally a six-month training.

8    Q  What are they doing during those four--let's talk

9       about Parole Case Analyst II.  What are they doing

10      for those six months while they're being trained?

11   A  Well, you first--the first training is explaining

12      to them the history of the Parole Commission, the

13      organization structure or how--how--in general

14      the--how business is done.  And we--post--post-

15      release is probably the first--is the easiest type

16      of release that's--that we do, and so we spend a

17      long time on that because that's a big part of the

18      inmate caseload, the inmates in prison right now.

19      And we just--they learn how to handle a case from

20      it being a new admission all the way through

21      release.  We're basically using the manual as the--

22      to get the outline, and then we use examples--I use

23      examples to show them how to do it.  And then they

24      practice, and--and I or one of the supervisors have

| | | |
|---|---|---|
| 1 | A | Yes.  And combined records also enters the length |
| 2 | | on the computer.  They can see it on a computer |
| 3 | | screen also, because you need that length to |
| 4 | | calculate release dates of inmates or parole |
| 5 | | eligibility dates. |
| 6 | Q | Is that the same for the crime, the conviction and |
| 7 | | the date of admission?  Does that come from |
| 8 | | combined records? |
| 9 | A | The date of admission is probably entered by the |
| 10 | | diagnostic center when someone comes to prison. |
| 11 | | That's probably where that information comes from. |
| 12 | | It's a movement in the prison, so that's where the |
| 13 | | date comes from. |
| 14 | Q | And the crime, the conviction comes from combined |
| 15 | | records? |
| 16 | A | I believe that a prison unit will originally enter |
| 17 | | some of the prison information from the judgment |
| 18 | | and commitment, 'cause the judgment and commitment |
| 19 | | comes with the inmate to the prison facility.  I |
| 20 | | don't know who at the prison unit enters it.  I |
| 21 | | don't know their title.  Combined records audits |
| 22 | | the information, meaning they may change it or |
| 23 | | leave it as-is.  But they are looking to make--and |
| 24 | | they're looking to make it correct. |

1       center, like what their level is when they come in.

2    Q  So most of the information that a parole case

3       analyst is pulling comes from these--these prison

4       screens?

5    A  Yes.

6    Q  They're kind of just summarizing it and bringing it

7       all together?

8    A  Yes.  And there--I mean, there can be--there are

9       analysts--also there are probation screens that

10      they--if someone has a probation history--they

11      might not can see everything.  They can't see the

12      narratives of what maybe an officer said about the

13      case as they were supervising them.  But they can

14      see if they still are on probation or if--what

15      their violations were when they were on probation.

16      They can see things like that.

17   Q  Yeah.

18   A  So they are reviewing probation screens too.

19   Q  Okay.  Probation screens and prison screens.

20   A  And prison screens.

21   Q  Does probation use the same computer system?

22   A  Yes.  Every--it's OPUS--the whole department uses

23      OPUS for offenders.

24   Q  And the thing about OPUS is--well--

1  Q  And a little above that where it says "Parole

2     denied," next to it is the name of two--two people.

3  A  The--those are commissioners.  I don't know if they

4     are the commissioners who voted or they are the

5     commissioners whose names the computer picked to

6     vote.  I don't know which.

7  Q  What's the difference?

8  A  It could be different--I mean, the computer will

9     pick--the analyst, when they're presenting it,

10    they'll hit a button, and it picks commissioners to

11    vote.  The commissioners have for many years agreed

12    they would vote for each other.  And so depending

13    on who's here, that's what our Office Assistant Vs

14    do.  They move the files--just a very small file

15    just so the commissioners know they need to vote.

16    And they will vote.  So I--

17 Q  Now, how many total people--commissioners vote on

18    each case?

19 A  It's always been--the law requires by majority.  So

20    there have been times when the Commission--there

21    were only three commissioners, so you're going to

22    see two out of three votes.  Currently there are

23    four commissioners, so it requires three out of

24    four votes.

| | | |
|---|---|---|
| 1 | A | They have to work here--they have to work in |
| 2 | | Raleigh here in the office.  They vote through a |
| 3 | | computer here.  They work--they--Monday through |
| 4 | | Friday, anytime between seven-thirty and six |
| 5 | | they'll--one or two of them will be here.  They are |
| 6 | | on call after hours also and on weekends in case-- |
| 7 | | they have to be available in case offenders that |
| 8 | | are on supervision violate.  Officers call them for |
| 9 | | emergency warrant requests.  But we don't--they |
| 10 | | don't work from their home in other words or--or-- |
| 11 | Q | But do they--do they work a full-time schedule? |
| 12 | A | Yes.  They were--the commissioners were part-time-- |
| 13 | | I don't remember if it was 2013 or '12 they became |
| 14 | | full-time.  I want to say it was 2012.  The |
| 15 | | legislature changed the positions back to full-time |
| 16 | | positions.  Even though one of them worked here |
| 17 | | full-time, he was only paid as a part-time |
| 18 | | commissioner. |
| 19 | Q | Okay.  And what are their tasks while they're in |
| 20 | | the office? |
| 21 | A | They monitor the computer.  They are voting both on |
| 22 | | cases that analysts are presenting to them for |
| 23 | | decisions, and they're also looking at the |
| 24 | | violations screen, where officers are reporting |

1      violation or noncompliance or requests for

2      modifications to them on that computer.  And our

3      support staff are watching the computer, not the

4      analyst side but the violations side, and they have

5      to help them activate decisions.  The commissioners

6      want their violations handled before they leave

7      each day.  So there--

8   Q  What do they have to do with violations?

9   A  They read what--the report that the officer is

10     saying what's going on.  And the officer's making a

11     recommendation if they want the Commission to

12     change a supervision condition or if they want a

13     warrant.  And the commissioners agree--just like

14     with analysts--may agree or disagree or they'll

15     write out what their vote is.

16  Q  Do you have any idea what their volume of work is

17     in a given day?

18  A  At any given time they could have a hundred cases

19     in front of the Commission from the analysts.  The

20     violation screen vary.  Usually late Friday

21     afternoon they get a lot of requests for warrants.

22     But, I mean, it's a constant during the day.  As

23     far as the number, the--this--our chairman keeps up

24     with some statistics.  And like as of this week,

1    the analysts have--the Commission has voted on the

2    analyst cases.  I think it was like fifteen

3    thousand two hundred and some cases that they've

4    reviewed and voted on in some way this year.  So

5    it's running at least two thousand a month of cases

6    they're voting from analysts.

7              And that's not the other work they do.

8    They're--they also on Tuesdays have the meetings.

9    Wednesday they do vi--violation hearings by

10   videoconference.  They used to go to Central Prison

11   and hold those.  They're not every case that's in

12   violation.  It's just the ones where the offender

13   has asked for a commissioner to hear their

14   violation is the ones that appear over the

15   videoconference.  And they are--they probably are

16   about thirteen a week of those.  Some weeks it got

17   pretty bad.  There was--like morning and afternoon,

18   there was like twenty-six in a day.  And I think

19   the commissioners split.  One did the morning, and

20   one did the afternoon.

21             But it--they're seeing this because of

22   justice reinvestment.  They can't--they have to

23   sometimes revoke people in partial amounts, like

24   ninety days instead of--it doesn't affect the old--

1        routing slip on it and maybe something--the

2        judgment and commitment might be made a copy of and

3        sent to the commissioners so they would know that

4        this is their case to vote on, 'cause there will be

5        a hundred cases maybe on the computer, but they

6        need to know which ones they need to vote on.

7   Q     Uh-huh (yes). Do they dedicate certain days to

8        voting on--on parole, or do they just do it in

9        between all the--the schedule that you mentioned?

10   A     They're voting all during the day. They don't say

11       "I'm just going to vote on parole today." They--

12       anything the analyst sends them they will vote.

13       They'll--they get that--so they might vote on a

14       parole case, and the next case is a post-release,

15       and the next case is a DWI. It doesn't matter to

16       them.

17   Q     Uh-huh (yes). And how long does it take?

18   A     It varies. I mean, a DWI that doesn't have enough

19       time, it's just simply them reading it and hitting

20       the button, because there's not another choice if

21       you don't have time to go. A parole case may--some

22       they just leave on their desk and think about it.

23       I mean, they--some they might get up and go talk.

24       I mean, they don't--parole cases probably would

1   A    They depend on the parole case--that's--they want

2         the parole case analyst to--to bring the case to

3         their attention and to--if they--they don't have

4         the information they need--maybe they read

5         something and it stirs--they want some more

6         information about that issue.  They'll tell the

7         analyst, and the analyst will go get the

8         information for them.

9   Q    Do the parole commissioners have access to OmniDocs

10        to like look at the whole file?

11   A    They do.  They don't necess--they don't necessarily

12        want to go in and do that because some of the

13        records are huge.  I mean, they vary in length.

14        But they do have access.  They can click a button--

15        the computer people have designed where they can

16        click a button and it takes them to the inmate

17        file.  So they can look up something if they choose

18        to.

19   Q    Do they do anything differently when they're

20        considering someone who was a juvenile when they

21        committed their crime?

22   A    They--they don't use any different process, no.

23   Q    All right.  You said that the confidential

24        secretary took daily statistical reports.

COUNTY OF WAKE

## C E R T I F I C A T E

I, Brandy Anderson Sadler, a Notary Public in and for the State of North Carolina, duly commissioned and authorized to administer oaths and to take and certify depositions, do hereby certify that on August 28, 2014, MARY STEVENS, being by me duly sworn to tell the truth, thereupon testified as above set forth as found in the preceding 119 pages, her examination being reported by me verbatim and then reduced to typewritten form under my direct supervision; that the foregoing is a true and correct transcript of said proceedings to the best of my ability and understanding; that I am not related to any of the parties to this action; that I am not interested in the outcome of this case; that I am not of counsel nor in the employ of any of the parties to this action, and that signature of the witness was waived.

IN WITNESS WHEREOF, I have hereto set my hand, this the 19th day of September 2014.

                         Notary Public
                         Notary No. 20010500227

Brandy Anderson Sadler
PACE REPORTING SERVICE
P. O. Box 252
Cary, North Carolina  27512
Telephone:  919/859-0000 - Raleigh
            910/433-2926 - Fayetteville
            910/790-5599 - Wilmington

Stevens                                            -i-

## E X A M I N A T I O N   I N D E X

Examination              By Whom              Page No.