IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:10-CT-3123-BO

| | | |
|---|---|---|
| SHAUN ANTONIO HAYDEN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| ALVIN KELLER, et al., | ) | |
| Defendants. | ) | |

On July 15, 2010, plaintiff Shaun Antonio Hayden ("Hayden"), proceeding pro se, filed

this complaint in this case pursuant to 42 U.S.C. § 1983. Compl., D.E. 1. After denying

defendants' motion to dismiss the matter, the court directed that Hayden be represented by North

Carolina Prison Legal Services, Inc. ("NCPLS"). Hayden v. Keller, No. 10-HC-2272-BO,

Orders, D.E. 9 and 25; Notices, D.E. 10-15, 22. NCPLS entered an appearance and, on

September 11, 2013, filed an amended complaint on Hayden's behalf pursuant to Section 1983.

Id.; Hayden, 5:10-CT-3123-BO, Am. Compl., D.E. 10 and Notice of Appearance, D. E. 13.

Cross motions for summary judgment are now before the court. Pl.'s Mot. Summ. J., D.E. 30;

Defs' Mot. Summ. J., D.E. 36. On July 27, 2015, the court held a hearing on the pending

motions. Min., D.E. 49. Thereafter, the motions were supplemented with statistical data and

additional briefing. Orders, D.E. 50 and 53; Responses, D.E. 52, 56-57; In this posture, the

matter is ripe for determination.

    A.    Issue

Hayden contends that, as a juvenile offender sentenced to a life sentence with parole, he

is owed something that adult offenders are not: a "meaningful opportunity to obtain release

based on demonstrated maturity and rehabilitation." Graham v. Florida, 560 U.S. 48, 75 (2010).

Hayden further contends that the North Carolina Post-Release Supervision and Parole

Commission ("Parole Commission" or "Commission") and their procedures do not afford him

that opportunity. Hayden seeks declaratory and injunctive relief, but no monetary damages.

B.     Facts

Hayden is a prisoner in the custody of the North Carolina Department of Public Safety

("NCDPS"). Hayden was born on October 6, 1966. Mem. in Supp. Pl's Mot. Summ. J., D.E. 31,

Decl. Hayden ¶ 1; Def's Mot. Summ. J., D.E. 36, Ex. A - Offender Info. He was fifteen years old

when he committed the crimes for which he is now imprisoned. Id., ¶¶ 2-3; Id., Ex. B and C -

Indictments, Probable Cause Hearing. Although Hayden was to be tried as an adult at the age of

sixteen, he did not go to trial, but pled guilty to first degree burglary; assault with a deadly

weapon with intent to kill inflicting serious injury not resulting in death; first degree sexual

offense; second degree sexual offense; first degree rape; attempted second degree rape; and

breaking and entering and larceny. Id. ¶ 4; Id., Ex. D. - Judgment and Commitment. The

maximum allowable prison term was two life terms plus 160 years. Def's Mot, Ex. C. Hayden

was sentenced to a term of his natural life. Pl's Mot. Summ. J., D.E. 31, ¶ 6. He has been in the

custody of the NCDPS since March of 1983, and he is now 48 years old.

Hayden became eligible to be considered for parole in 2002, after serving a term of

twenty years. N.C. Gen. Stat. § 15A-1371(a1) (1983). The Parole Commission has considered

him for parole every year[1] since 2002 under the normal adult offender parole procedures. Pl's

---

[1] At the oral argument, counsel for defendants acknowledged that the annual review is not
a date certain but generally occurs within a relative time frame of one year after the offender's
last review.

2

Mot. Summ. J., ¶ 7; D.E. 32, Ex. B, Parole Comm'n Records. Each year parole has been denied at the first level of review. Id., ¶ 8.

In North Carolina, the Parole Commission is the independent agency responsible for evaluating offenders for parole release. See N.C. Gen. Stat. § 143B-720(a). The Parole Commission consists of four commissioners, assisted by a chief administrator and staff. Mem. in Supp. Pl's Mot. Summ. J., D.E. 32, Dep. Mary Stevens (Agent of Parole Commission), at 20. The Commission employs a staff of thirty-six people including a psychologist, two lead parole case analysts, and sixteen parole case analysts. Dep. Stevens at 8-9. For each case, the assigned analyst researches the record and the inmate file, including using such specific criteria that the Commission has said they want to know about the case, and then prepares a written report and recommendation. Id. at 21, 25, 33-34, and 45. Caseloads are high: each parole case analyst is responsible for approximately 4,338 offenders. Dep. Stevens at 28. According to Paul Butler, the Chairman of the Parole Commission, the most important information in the summary includes the following: the official crime version (narrative of events of crime of conviction); prison infraction history; gang membership; psychological evaluations; custody level history; visitation history; and a home plan. Dep. Butler at 51-52. Special weight is given to the "brutality of the crime." Id. at 54-55.

As for the commissioners, they work full-time for the Commission. Dep. Stevens at 104. The law requires a majority of commissioners (three out of four) to vote on every case. Id. at 86; N.C. Gen. Stat. § 143B-721(d). They vote on in excess of 2,000 cases every month, not including other work the commissioners do. Id. at 106. As of September 2014, the Parole Commission had reviewed about 15,200 parole cases for that year. Id.

3

The parole process is a two step process. Step one, or level one, is referred to as the "review." Dep. Stevens at 20-12. Step two, or level two, is referred to as the "investigation." Id. At the "review" stage, the parole case analyst relies on any psychological evaluations contained within the offender's prison file. Dep. Stevens at 63. After writing the summary of the prison file, and making a written recommendation for or against granting parole, the parole case analyst provides the information to a commissioner. Id. at 43.

The commissioners make independent electronic votes. Ex. E. Dep. Butler at 50; Ex. D. Dep. Stevens at 104, 107. They do not consult one another in casting their ballots, nor do they cast their ballots in the same room. Ex. E, Dep. Butler at 50-51. On a "fairly typical day," a commissioner casts approximately 91 votes. Id. at 25. The commissioners have many other responsibilities including presiding over Post-Release Supervision Revocation hearings, attending training, overseeing office administration, reviewing statistical reports, making field visits to jails and probation offices, approving warrants for arrest, and meeting with members of the public on Tuesdays. Id. at 14, 18-19, 23-24, 31, 33; Dep. Stevens at 71. The commissioners vote on felony parole cases five days a week. Dep. Butler at 62.

The Parole Commission does not provide notice to a juvenile offender in advance of his/her parole review; there is no opportunity for a juvenile offender to be heard during the course of his/her parole review; and, the commissioners do not hold an in-person hearing to deliberate together on the question of a juvenile offender's suitability for parole.[2] Dep. Stevens

---

[2] Since 2012, the only notice given at the review stage is to "any active victim." Prior to 2012, notice was not provided to any party. Dep. Stevens at 50.

4

at 43-53. The commissioners are not aware, and do not consider, whether a particular offender was a juvenile at the time of his/her offense. Dep. Stevens at 111.

Testimony states that a commissioner's usual vote is "no" on felony parole at the "review" stage. Dep. Stevens at 98. If the vote is not "no," the commissioner will most likely vote "incomplete," and recommend an "investigation." Id. At the "investigation" stage, the parole case analyst notifies the offender, the offender's prison facility, the victim, the prosecuting district attorney, and law enforcement. Id. at 45, 48-49. It is normal practice for the commission to order a psychological report to be conducted on the offender at this second level of review. Dep. Butler at 35. All such reports must be completed by the Parole Commission's staff psychologist, Dr. Denis Lewandowski. Dep. Stevens at 18. The probation department is requested to investigate the feasibility of the offender's proposed home plan. Id. at 54. If the "investigation" shows that the candidate for parole is promising, the Parole Commission will normally offer a "MAPP contract"—which is a contract between the offender, the prison, and the Parole Commission. Dep. Butler at 36. The contract lets an offender work through different custody levels and "get on work release for one to five years before they are released." Dep. Stevens at 77-79. The MAPP contract is ordinarily a mandatory step toward felony parole. Id. at 20-21; Dep. Butler at 60. Hayden has been denied parole at the review stage each year since 2002, thus never reaching the level two investigation.

Reasons for parole denial are considered confidential. Records created, received, and used by the Parole Commission in the performance of its statutory duties are likewise

5

confidential and are not subject to disclosure under the Public Records Law.[3] 1996 Op. Atty

Gen'l 36 (April 24, 1996).

The court notes that while the affidavits of the two commissioners before the court state

no consideration of age is given in a parole review, there is evidence in the record that at least

one case analyst did negatively consider age as a parole factor. The analyst review reads as

follows:

> Hayden was 15 years old when he committed these crimes. In 3/07 DOP completed
> a risk assessment which found Hayden to be an acceptable risk for unsupervised
> access to the community. **It is important to note that in the risk assessment it
> was further noted that the young age that Hayden did the crimes and the fact
> that he has spent much of his developmental life in prison suggests he will
> always require at least moderate level of supervision since it is unlikely that he
> has significant coping skills and decision making ability to function well without
> good guidance.** In 11/10 DOP completed another risk assessment which found him
> to be an unacceptable risk for unsupervised access to the community. Based on the
> belief that Hayden would not adhere to the conditions of parole and the risk he poses
> to public safety, it is recommend that parole/Mapp be denied.

D.E. 32-4 at 7-8.

One additional source of information about some offenders is the commissioners'

meetings with the public. Members of the public have the right to visit the Parole Commission

on Tuesdays. Dep. Stevens at 71. Availability is on a first-come, first-serve basis, and if a

member of the public misses an offender's annual parole review, he or she must try again the

following year. Id. at 71-72.

---

[3]Plaintiff filed a motion to seal certain documents due to this provision. Defendants do
not seek for the information to be sealed and waive the requirement. The motion [D.E. 33] is
DENIED.

Throughout this process, every felony offender—adult or juvenile—is reviewed in the same way. Dep. Stevens at 39. The Parole Commission gives no consideration to an offender's age at the time of the offense. Dep. Butler at 54.

An expert report to identify the overall differences between paroled and non-paroled prisoners in the North Carolina system also provides relevant information.[4] Ex. F, Expert Report

---

[4]The report sets out its findings in the context of this historical background:

The parole system in North Carolina has undergone numerous changes since its original inception in 1868. In its earliest form, the governor was empowered with the ability to make decisions regarding reprieves, commutations, and pardons, and this was expanded to include a system of supervised release. The governor or his staff retained this authority until 1955, when North Carolina established the state's earliest Parole Commission, which had exclusive authority to grant, revoke, and terminate parole. For the next 26 years, the Parole Commission had a great deal of discretion in making parole decisions, which sought to emphasize rehabilitation and public safety. However, in the 1980s, concerns about sentence disparities and a growing prison population gave rise to a new set of rules and standards. In 1987, the General Assembly passed the Prison Population Stabilization Act, known as the prison cap, which mandated that the Commission keep the prison population below a legally-determined level. This dramatically changed the parole process in North Carolina for the duration of its tenure, which ended in 1996. During this time, many inmates found guilty of misdemeanors were released categorically, without much consideration to their degree of rehabilitation or to public safety, as a way to prevent prison overcrowding. In 1994, the system changed yet again with the passage of the Structured Sentencing Act, which eliminated the parole system as it had previously existed, and removed the Commission's discretionary role for most crimes committed after October 1, 1994, with the exception being those incarcerated for driving under the influence.

This report aims to analyze the factors that influence the probability of being granted parole by the Commission for a certain class of offenders, namely those with life sentences convicted before 1995. By focusing on this select group of inmates, it is possible to limit the influence of the changing legal environment. First, by choosing only those prisoners who were convicted prior to 1995, we can be sure that the prison population we are analyzing was and is subject to the Parole Commission's discretion. Second, by focusing our analysis on those prisoners with life sentences, invariably guilty of serious felonies, we can be confident that such prisoners would not have been subject to any categorical release programs as a way to address prison overcrowding.

7

of Bryan Gilbert Davis. The report found that the statistical data shows that older offenders, offenders who have reached 58 to 59 years of age, are more likely to be paroled than younger offenders. Id. at 8. However, the length of an offender's incarceration seems to have no impact on whether or not the offender will be paroled. Id. at 17-18. Merely being in prison longer is not enough to increase parole likelihood. Id. The report found that a vast majority of the paroled offenders to have a low infraction history in prison. Id. The report found that "compared against the base case of violent crime, sex offenders are significantly less likely to be paroled." Id. "On the other hand, perpetrators of property crimes (which include burglary and arson in this model) are only slightly more likely to be paroled than violent offenders." Id. The report also found that those that attempt escape are significantly less likely to be granted parole. Id.

Additional statistical data from 2010-2015 shows the following for inmates with no release date or serving a life sentence:

1.      In 2015, a total of 531 inmates are eligible for annual parole review. Because 24 of these individuals were assigned to treatment or MAPP programs, only 507 inmates will actually receive an annual parole hearing. So far this year, six of these inmates have received parole (1.2% of those considered). In 2015, 34 juvenile offenders are eligible for parole, and one has received parole.
2.      In 2014, a total of 529 inmates were eligible for annual parole review. Because 43 of these individuals were assigned to treatment or MAPP programs, only 486 actually received an annual parole hearing. Nine of these actually received parole (1.9% of those considered). In 2014, 35 juvenile offenders were considered for parole, but none received parole.
3.      In 2013, a total of 508 inmates were eligible for annual parole review. Because 63 of these individuals were assigned to treatment or MAPP programs, only 445 actually received an annual parole hearing. Six of these actually received parole (1.4% of those considered). In 2013, 32 juvenile offenders were considered for parole, but none received parole.
4.      In 2012, a total of 490 inmates were eligible for annual parole review. Because 53 of these individuals were assigned to treatment or MAPP programs, only 437 actually

---

Id. at 2-3.

8

received an annual parole hearing. Ten of these actually received parole (2.3% of those considered). In 2012, 29 juvenile offenders were considered for parole, but none received parole.

5.    In 2011, a total of 446 inmates were eligible for annual parole review. Because 35 of these individuals were assigned to treatment or MAPP programs, only 411 actually received an annual parole hearing. Eleven of these actually received parole (2.7% of those considered). In 2011, 28 juvenile offenders were considered for parole, but none received parole.

6.    In 2010, a total of 421 inmates were eligible for annual parole review. Because 50 of these were assigned to treatment or MAPP programs, only 371 actually received an annual parole hearing. Twenty-two of these actually received parole (5.9% of those considered). In 2010, 32 juvenile offenders were considered for parole, and six received parole.

D.E. 52, Response of Def. Butler to Court Order.

C.    Discussion

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249–50. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

9

"To state a claim under [section] 1983, a plaintiff must allege the violation of a right

secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law." West v. Atkins, 487

U.S. 42, 48 (1988); see Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

Hayden contends he has been denied his constitutional rights to be free from cruel and unusual

punishment and to due process pursuant to the Eighth and Fourteenth Amendments of the

Federal Constitution. Specifically, he claims these rights have been infringed because defendants

have denied him (in the status of a juvenile offender) from receiving a meaningful opportunity to

obtain release through parole based on the Supreme Court's holdings in Graham and Miller v.

Alabama, 132 S. Ct. 2455 (2012).

To begin, it is well established that "[t]here is no constitutional or inherent right of a

convicted person to be conditionally released before the expiration of a valid sentence."

Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 7 (1979); cf. Hawkins v. Freeman, 195 F.2d

732, 747 (4th Cir. 1999) (indicating that there is no fundamental right to parole release).

Likewise, in the Fourth Circuit, a State is not constitutionally obligated to provide a parole

regime. Vann v. Angelone, 73 F.3d 519, 521 (4th Cir. 1996). Therefore, offenders' limited right

to consideration for parole finds its roots in State law. See Burnette v. Fahey, 687 F.3d 171, 181

(4th Cir. 2012).

In North Carolina, the Parole Commission has the exclusive discretionary authority to

grant or deny parole. See N.C. Gen. Stat. § 143B-720 (2014) (authority of Parole Commission),

and N.C. Gen. Stat. § 15A-1371(d) (indicating that the Parole Commission "may refuse to

release on parole a prisoner it is considering for parole if it believes" the prisoner falls under any

10

of the criteria detailed in the statute); see also Goble v. Bounds, 13 N.C. App. 579, 583, 186

S.E.2d 638, 640 ("We conclude that honor grade status, work release privilege, and parole are

discretionary acts of grace or clemency extended by the State as a reward for good behavior,

conferring no vested rights upon the convicted person."), aff'd, 281 N.C. 307, 188 S.E.2d 347

(1972) (emphasis added). The Fourth Circuit has determined that due process requires only that

authorities "furnish to the prisoner a statement of [their] reasons for denial of parole." Vann, 73

F.3d at 522 (quoting Franklin v. Shields, 569 F.2d 784, 801 (4th Cir.1977)). There is no

differentiation between adult and juvenile offenders in North Carolina's parole scheme.

The Supreme Court in Graham viewed the question, not as one of due process, but in

terms of the constitutional protections found within the Eighth Amendment. They held

> [t]he Eighth Amendment states: Excessive bail shall not be required, nor excessive
> fines imposed, nor cruel and unusual punishments inflicted. To determine whether
> a punishment is cruel and unusual, courts must look beyond historical conceptions
> to the evolving standards of decency that mark the progress of a maturing society.
> This is because the standard of extreme cruelty is not merely descriptive, but
> necessarily embodies a moral judgment. The standard itself remains the same, but
> its applicability must change as the basic mores of society change.

Graham, 560 U.S. at 58. Importantly, Graham then found that "[t]he Constitution prohibits the

imposition of a life without parole sentence on a juvenile offender who did not commit

homicide." 560 U.S. at 82; see also Miller, 132 S. Ct. at 2465 (recognizing "this Court held in

Graham [ ] that life without parole violates the Eighth Amendment when imposed on juvenile

nonhomicide offenders"). The Court continued that when a state sentences a juvenile and

"imposes a sentence of life it must provide [that child] with some realistic opportunity to obtain

release before the end of that term." Graham, 560 U.S. at 82. Therein, the opportunity must be

"meaningful" and "based on demonstrated maturity and rehabilitation." Id. at 75.

11

Thus, the question presented here is whether the parole process in North Carolina

provided to a juvenile offender serving a life sentence with parole comports with Graham. In this

court's review, it is important to start with the Supreme Court's holding that in fact "children are

different." Miller, 132 S. Ct. at 2470. Juveniles have "lessened culpability" and a "greater

capacity for change." Miller, 132 S. Ct. at 2460. The Supreme Court has banned life without

parole as a punishment for juvenile nonhomicide offenders. Graham, 560 U.S. at 48. Absent

some meaningful parole process for nonhomicide juvenile offenders, Hayden argues his life

sentence is de facto one of exactly that, life without parole—because he will never be granted the

opportunity to obtain release by demonstrating his increased maturity. While "[a] state is not

required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime .

. . [w]hat a State must do . . . is give defendants . . . some meaningful opportunity to obtain

release based on demonstrated maturity and rehabilitation." Graham, 560 U.S. at 75.

Clearly Graham created a categorical bar or flat ban on imposition of a sentence of life

without the possibility of parole on juvenile nonhomicide offenders. Graham, 560 U.S. at 48; see

Johnson v. Ponton, 780 F.3d 219, 222 (4th Cir. 2015) (Graham "categorically barred

life-without-parole-sentences for juvenile nonhomicide offenders"); In re Vassell, 751 F.3d 267,

269–70 (4th Cir. 2014) (defendant's petition for habeas relief was untimely because his right to

relief first became available after Graham, which "prohibited imposing any sentence of life

without parole—mandatory or individualized—for juveniles convicted of committing

nonhomicide offenses"); In re Sloan, 570 F. App'x 338, 339 (4th Cir. 2014) (Graham held "the

Eighth Amendment prohibits a sentence of life without parole for any juvenile offender [ ] who

did not commit homicide"). The Supreme Court in Miller further extended the reasoning in

12

Graham to *mandatory* sentences of life without parole for juveniles convicted of homicide offenses. Miller, 132 S. Ct. at 2467. Under Miller, a State may ultimately impose a life without parole sentence against a juvenile convicted of homicide, but only after the sentencer has the opportunity to consider all the mitigating circumstances, including the offender's age and age-related characteristics. Id. at 2475. In doing so, the Supreme Court emphasized that, "given all we have said in Roper, Graham, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." See id. at 2469.

In applying these principles set out by the Supreme Court, other courts have held that Miller and Graham apply to lengthy term-of-years sentences or aggregate sentences. See Moore v. Biter, 725 F.3d 1184, 1192 (9th Cir. 2013) (a sentence of 254 years is materially indistinguishable from a life sentence without the possibility of parole); Casiano v. Comm'r of Correction, 317 Conn. 52, 79, 2015 WL 3388481 at *11 (Conn. May 26, 2015) ("a fifty year term and its grim prospects for any future outside of prison effectively provide a juvenile offender with 'no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope.'"); Brown v. State, 10 N.E.3d 1, 7–8 (Ind. 2014) (reducing a juvenile's sentence to eighty years after concluding that, while the trial court acted within its discretion when it imposed a sentence of 150 years for murder, such a sentence "means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of the [juvenile] convict . . ."); Bear Cloud v. State, 334 P.3d 132, 144 (Wyoming 2014) (an aggregate sentence of just over forty-five years was the de facto equivalent of a life sentence without parole); State v. Null, 836 N.W.2d 41, 72 (Iowa 2013)

13

("Miller's principles are fully applicable to a lengthy term-of-years sentence"); People v.

Caballero, 55 Cal.4th 262, 145 Cal. Rptr.3d 286, 282 P.3d 291, 296 (Cal. 2012) ("sentencing a

juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that

falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual

punishment in violation of the Eighth Amendment"); but see Bunch v. Smith, 685 F.3d 546,

552–53 (6th Cir. 2012) (even though an aggregate sentence of eighty-nine years may be the

functional equivalent of life, Graham applied only to sentences of "life," not aggregate sentences

that result in a lengthy term of years); State v. Brown, 118 So.3d 332, 342 (La. 2013) ("nothing

in Graham addresses a defendant convicted of multiple offenses and given term of year

sentences"). Courts have also rejected state "geriatric release provisions" by which a

nonhomicide juvenile offender sentenced to life without parole may apply for geriatric release as

"inconsistent with the Eighth Amendment." LeBlanc v. Mathena, 2015 WL 4042175, at *11-18

(E.D. Va. 2015) (quoting and citing Graham, 560 U.S. at 76). Furthermore, courts have

determined that Miller-type protections, i.e., individualized sentencing evaluations, are

constitutionally required in cases where a juvenile is sentenced to either a de facto life sentence,

or to a term of years that would effectively deprive him of a meaningful opportunity for release

on parole during his lifetime. Greiman v. Hodges, 79 F. Supp. 3d 933, 938-945 (S.D. Iowa 2015)

(defendants denied plaintiff a meaningful opportunity to obtain release by failing to consider

plaintiff's youth at the time of the offense and by failing to consider plaintiff's demonstrated

growth, maturity, and rehabilitation as part of the parole review process); State v. Null, 836

N.W.2d 41, 72–76 (Iowa 2013) (holding that Miller's protections are fully applicable to "a

lengthy term-of-years sentence" and require judges sentencing juveniles to recognize: (1) that

14

children are constitutionally different than adults and cannot be held to the same standard of culpability in sentencing; (2) that children are more capable of change than adults; and (3) that lengthy prison sentences without the possibility of parole for juveniles are appropriate, "if at all, only in rare or uncommon cases"). Lastly, Graham explicitly holds that "[w]hat the State must do is give some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Graham, 560 U.S. at 75. "It is axiomatic that a juvenile offender could only prove increased maturity and rehabilitation warranting release from custody at some time well after a sentence is imposed." Greiman, 79 F. Supp. 3d at 943; see Graham, 560 U.S. at 79 (the Eighth Amendment does not permit a State to deny a juvenile offender the chance "to later demonstrate that he is fit to rejoin society based solely on a nonhomicide crime that he committed while he was a child in the eyes of the law").

The same principles apply here. If a juvenile offender's life sentence, while ostensibly labeled as one "with parole," is the functional equivalent of a life sentence without parole, then the State has denied that offender the "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" that the Eighth Amendment demands. See Greiman, 79 F. Supp. 3d at 944 ("a de facto life without parole sentence . . . is prohibited by Graham and its progeny"). In the case before this court, it is evident that North Carolina has implemented a parole system which wholly fails to provide Hayden with any "meaningful opportunity" to make his case for parole. The commissioners and their case analysts do not distinguish parole reviews for juvenile offenders from adult offenders, and thus fail to consider "children's diminished

15

culpability and heightened capacity for change" in their parole reviews.[5] Miller, 132 S. Ct. at 2469; see Greiman, 79 F. Supp. 3d at 943.

For each case reviewed, the assigned analyst researches the record and the inmate file and then prepares a written report and recommendation. The most important information found in the summaries has been noted as: the official crime version (narrative of events of crime of conviction; prison infraction history; gang membership; psychological evaluations; custody level history; visitation history; and a home plan. There is no information about one's status as a juvenile offender. There is no specific information about maturity or rehabilitative efforts. There is no special process for one convicted as an adult before the age of 18, and the commissioner are unaware of that status. Absolutely no consideration is to be given for that status by the commissioners.

Furthermore, caseloads are enormous and each parole case analyst is responsible for approximately 4,338 offenders. The sheer volume of work may itself preclude any consideration of the salient and constitutionally required meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. Special weight is given to the brutality of the crime.

---

[5] Although Hayden's parole case file explicitly states that he was fifteen when he committed his offense, it is difficult for this court to believe that a parole commissioner can fully take into "consideration [Hayden']s chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences[,]" Miller, 132 S. Ct. at 2468, when reading Hayden's case file along with 90 others in a single day. Indeed, if anything, defendants have demonstrated that North Carolina's juvenile offenders face *harsher* treatment during parole reviews because the young age at which the crime is committed may actually be used as a negative factor in parole consideration by the case analyst preparing the report for the voting commissioners. See LeBlanc, 2015 WL 4042175, at *14 ("If it can be said that Virginia's sentencing scheme treats children differently than adults, it would be because, tragically, the scheme treats children *worse*." (italics in original)); see also Miller, 132 S. Ct. at 2464–65 (identifying a number of reasons which "establish that children are constitutionally different from adults for purposes of sentencing").

16

Special weight is not given, much less taken into consideration, of the age at which the crime was committed.

As for the public meeting, without providing notice to the offender, his/her family members, or others who may be able to provide relevant information about the offender's rehabilitation and maturity efforts, the opportunity appears to exist mainly for those on notice. Since 2012, those are the active victims. Such notice is undoubtedly important to victims. Likewise, the failure to provide the same notice to juvenile offenders denies them "a chance to demonstrate maturity and reform." Graham, 560 U.S. at 79.

The data before the court also indicates that juvenile offenders are rarely paroled. Again, "[a] State is not required to guarantee eventual freedom to a juvenile convicted of a nonhomicide crime." Graham, 560 U.S. at 75. Thus, the information from four of the past five years that no juvenile offenders obtained release while adult offenders did obtain parole is relevant only in that it raises questions about the meaningfulness of the process as applied to juvenile offenders. Furthermore, the research regarding North Carolina parolees is that inmates having committed brutal crimes, most specifically sexual crimes, are least likely to be paroled. Hayden was convicted of sexual crimes.

Next without notice of one's status as a juvenile prior to review, the record upon which each commissioner relies is unable to convey or demonstrate maturity or rehabilitation. For example, Hayden has been found guilty of 41 disciplinary infractions throughout his 32 years of incarceration; however, of those infractions he was only convicted of seven infractions since 2000, and one in the last five years. http://webapps6.doc.state.nc.us/opi/viewoffender

17

infractions.do?method=view&offenderID=0174678&listpage=1&listurl=pagelistoffendersearchr esults&searchLastName=hayden&searchFirstName=shaun&obscure=Y (last viewed Sept. 22, 2015). This information has significantly different meaning depending on the context in which it is viewed. It gives meaningful insight into gaining, or failing to gain, maturity and rehabilitation if the commissioner views it knowing Hayden was sentenced as a juvenile offender. Viewed in the absence of that knowledge, it simply illustrates a high number of disciplinary infractions which are statistically damaging to one's chance for parole.

Finally, regardless of the fact that juvenile offenders will most likely be serving disproportionately longer sentences, the longer sentence does not present an opportunity for parole. What presents the best statistical opportunity for parole is to obtain the age of 58 to 59 having committed a non-sexual crime. Again, this is not the holding in Graham. 560 U.S. at 59 (citing Weems v. United States, 217 U.S. 349, 367 (1910)) ("The concept of proportionality is central to the Eighth Amendment. Embodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'"). The court finds that the North Carolina parole process violates the Eighth Amendment as outlined in Graham.

Defendants argue that Hayden faults the parole review process simply because he himself has been unable to obtain parole. It is true that Greenholtz—which notably did not address whether Nebraska's parole scheme comported with due process as applied to juvenile offenders—held that "a mere hope" of parole suffices. 442 U.S. at 11; see Hawkins, 195 F.2d at 747. But even Greenholtz acknowledged that "due process is flexible and calls for such procedural protections *as the particular situation demands*." 442 U.S. at 12 (emphasis added).

18

The Supreme Court has now clarified that juvenile offenders' parole reviews demand more procedural protections. See Graham, 560 U.S. at 79; Greiman, 79 F. Supp. 3d at 945. Clearly, in North Carolina's parole process there is no advance notice or opportunity for juvenile offenders to be heard on the question of maturity and rehabilitation — either in writing or in person.[6] The offender is an entirely passive participant in North Carolina's parole review process. What Hayden seeks is what he is constitutionally entitled to, "a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Id. North Carolina's parole process fails to meet this constitutional mandate.

D.    Conclusion

The court denies defendants' motion for summary judgment [D.E. 36] and grants in part and denies without prejudice in part Hayden's motion for summary judgment [D.E. 30]. Specifically, the court finds that the current North Carolina parole review process for juvenile offenders serving a life sentence violates the Eighth Amendment. Having so held, the court is guided by the mandate of Graham which instructs that "[i]t is for the State, in the first instance, to explore the means and mechanisms for compliance." 560 U.S. at 75. Thus, the court denies without prejudice Hayden's request for the injunctive relief and gives the parties 60 days to present a plan for the means and mechanism for compliance with the mandates of Graham to provide a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation to juvenile offenders convicted as adults.

_____

[6]Although the level two investigation does provide offenders with notice and an opportunity to be heard via a psychological report, the infinitesimal percentage of juvenile offenders who make it to this level of review does not constitute the meaningful opportunity described in Graham. 560 U.S. at 82 (the parole review scheme "must provide [the juvenile offender] with some realistic opportunity to obtain release.")

19

SO ORDERED, this 25 day of September 2015.

*Terrence W. Boyle*

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

20